Filed 5/27/15  P. v. Zamudio CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049889 |
| v. | (Super. Ct. No. 11NF3721) |
| EDGAR SALVADOR LUCIO ZAMUDIO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Patrick Donahue, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Sharon Rhodes and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Edgar Salvador Lucio Zamudio (defendant) of second degree murder in the death of Ricardo Rios. The court sentenced him to an indeterminate term of 15 years to life.

Defendant claims the court made evidentiary errors and failed to properly instruct the jury. We conclude defendant's claims are meritless and affirm the judgment.

**FACTS**

*Prosecution Evidence*

In 2011, then 47-year-old Rios lived in the converted, detached garage of Don Murphy's Buena Park home. Spinal injuries forced Rios to walk with a cane. Defendant, then a student in his early 20's, lived in Victorville. Defendant met Rios through a mutual friend.

*a. 911 call*

At 3:30 a.m. on December 14, defendant made a 911 call. Defendant gave Murphy's address in Buena Park and said Rios assaulted him. Defendant stated, "I had . . . [¶] . . . to act in self defense . . . [¶] . . . because I was gonna get stabbed . . . ." Defendant described Rios as a friend. Defendant also said he was scared because Rios was "going hysterical." He told the operator he "pushed [Rios] to the floor and I hit a couple . . . ." The operator asked defendant if he had been hurt. Defendant responded he was not seriously injured and did not need emergency help.

Defendant told the 911 operator Rios had recently been in a mental hospital. He also said Rios had been taking Norco and drinking alcohol. Defendant complained he went to Rios's home to help him, but "he ends up attacking me . . . I regret that I had to attack him back." Defendant said Rios had a couple of Samurai swords and knives, and "razors all over the place, but I'm sure he won't use it against you guys." After telling the operator Rios also had combat knives because he was in the Army or Marines, defendant said, "I don't know what his problem is but, but look it, in a nutshell

2

ma'am I got attacked so I had to get him off of me.  [¶] . . . [¶] I hit him in the face about three times and I left [in] my Cadillac . . . my windshield is broken."  When the operator learned defendant was driving on the freeway, she tried to persuade him to come to the Buena Park Police Department to give a statement.  Defendant said he did not want to turn around and ended the call.

### b. Crime Scene

Buena Park police officers responded to Murphy's home within minutes of defendant's 911 call.  They found an 8.2 pound cinder block lying on grass near the garage, and a 3.8 pound metal counterweight lying about halfway up the driveway.  They announced themselves at the door to the garage, but no one responded.  Inside, they found Rios's body lying in a pool of blood.  He was wearing pants, a dark-colored shirt, and a camouflage sweater over long johns, a black T-shirt, and black and white boxer shorts.

Murphy told police he had been drinking alone in his living room from the evening of December 13, 2011 through the early morning hours of December 14, 2011.  He said a man driving a cream-colored Cadillac asked if he could borrow some money from him, but Rios told him not to give the man money.  Murphy also said Rios had spoken to him in a loud voice, but he had never touched Murphy.  Murphy said he did not hear Rios in any kind of altercation that night.

### c. Telephone Call

Around 9:00 a.m., defendant called the Buena Park Police Department and talked to Buena Park Police Detective Richard Pino.  The call was recorded.  Pino asked how defendant knew Rios.  Defendant explained he met Rios the previous summer through the mother of one of his two children, and that Rios became a "close family friend" over time.  Defendant told Pino "all I wanna say is that you know what, I was just

3

protecting myself.  I had a cylinder [1] thrown at me.  My car's damaged.  I have a broken windshield.  I have a busted lip.  And all I did to act in self-defense was I hit him in the face three times and he fell."  Defendant further explained, "And I left . . . it was just really . . . I don't know, it could have gotten gang related and I just wanted to leave, and I'm just scared about what's going on right now . . . ."

Pino asked defendant why he thought Rios had attacked him.  Defendant explained, "I live in Victorville, and I drove all the way down because . . . there's some issues going on already in this person's life and . . . I figured I'd come by and try to help him out . . . apparently he was just a little bit . . . he had a little bit too much alcohol and mixing medications and whatnot."  Defendant said Rios saw psychiatrists and had "a lot of issues."

Defendant said the conflict with Rios had lasted just a few seconds, and he promptly went to Murphy for help.  Defendant was concerned and called police because "I just don't want any problems 'cause, you know, I'm near completion of my [bachelor's degree] and, and I hope this is not a drawback that's gonna hold me back a lot, because I don't know if he pressed charges on me or anything like that, but, you know, if anything, he started it and the only reason I left was because I was threatened and, uh, I had to leave."

Pino again asked defendant what had started the previous night's disagreement.  Defendant said a disagreement started after he borrowed money from Rios, and Rios said some "weird" and "inappropriate" things.  Pino asked if Rios made "a sexual advance towards you."  Defendant said yes.  Pino replied, "Okay, so he made a sexual advance towards you and you didn't like that?"  Defendant said, "Absolutely not." Pino asked defendant if he had "ever had relations" with Rios.  Defendant responded, "No.  No, no, no."

---

<sup>1</sup> Defendant repeatedly used the word cylinder to describe one of the objects Rios threw at him.  The record establishes that the object was actually a concrete cinder block.

4

According to defendant, when he told Rios he wanted to go home, Rios "got hysterical, and he got a cylinder, threw it on my stomach, and he got a metal object and he cracked my windshield, and he busted my lip. And after that, I had enough and I socked him in the face three times and he fell down to the floor and I left after telling [Murphy] what had happened, and now I guess the police are looking for me . . . ." Pino asked if Murphy had seen anything and defendant said, "Yeah, he did, but you know what, this man must have Alzheimer's or something. I'm sure he might remember episodes, but, uh, he knew everything, 'cause he said it himself, he didn't want any problems and I was just ready to leave before, you know, he started getting crazy."

Defendant said, "It was really fast. And I just don't wanna be in trouble because, you know, I was only acting in self-defense. This guy claims that he's disabled, but he's not 'cause he's just trying to fuck over the Worker's Comp, and uh – but that's a whole different story. And if he wants to press charges against me, then he could bring it on because he started it and I called you guys, you know. If I had guilt, I would have just left completely and not said anything and – you know, 'cause I was worried about what was gonna happen and what's going on, and I'm still worried about how he is. [¶] . . . [¶] You know, I don't know what the hell to do now because I have my whole career in front of me and now I have this happening."

### d. Prearrest In-Person Statement

At about 10:30 a.m., defendant appeared at the Buena Park Police Department. An officer took photographs of defendant and he consented to a blood draw.[2] Pino saw a cut on defendant's lip, which defendant attributed to Rios, and defendant pointed to an area on his right side and said that was where a cinder block hit him. Pino told defendant he was not under arrest and free to leave at any time. Defendant said he understood.

---

[2] Forensic testing revealed the presence of THC and its metabolite THCA in defendant's blood.

Pino obtained defendant's full name, his age (22), occupation (college student), and the fact he has two daughters. Defendant again explained he had driven from his home in Victorville to Rios's room in Buena Park because Rios had recently attempted suicide. According to defendant, everything was fine until Rios tried to touch him. He became uncomfortable and asked Rios for gas money. Rios refused to give him money so defendant went to Murphy. Rios pushed Murphy and threw a blanket over Murphy's head. Defendant encouraged Murphy to call adult services on Rios, and told Rios to calm down. Rios started to talk about a plan he had to leave the country, and defendant "socked him in the face three times . . . ." Defendant said he thought Rios might be hurt because defendant, at six feet, five inches tall, and weighing 240 pounds, was considerably larger than Rios.

Defendant explained in the beginning of their relationship, Rios gave him money and everything "seemed great." However, Rios started to act like he thought defendant owed him something, and that made defendant uncomfortable. As defendant explained, "no boy likes to get their pants pulled down, and – I was trying to go to sleep when all this . . . started happening." What happened, according to defendant, was Rios got drunk and started to act "stupid and, you know, gay." When Rios insulted defendant's mother, defendant thought to himself, "this guy . . . he's really crossing the line here."

Rios then threw a cinder block at defendant. Defendant grabbed Rios in a choke hold and said, "You better fucking stop." Rios did not stop so defendant hit him in the mouth and face three times. After he hit Rios, defendant called the police and talked to Murphy, and he left. As defendant explained, "I don't know if he got the wrong vibe from me, or he probably wanted to fuck me or something. But I just made a big mistake. Being around this person, and especially 'cause he already has issues of his own, and, you know, to align with like . . . I just should have never surrounded myself around him or anything like that because somehow, like he said that he was gonna make my life easy,

6

and that I didn't have to worry about anything anymore. And I'm just like I don't know what you're talking about. "Cause . . . a hundred and thirty something thousand dollars from Worker's Comp., and he's already getting like thousands of dollars from the insurance company. So that's how he supplies me with all this cash and stuff. Now I realize, you know, like I'm such an idiot, and I was gonna get raped, you know what I mean? Like me, I'm this big and not too many people can fuck with me, you know. If I'm gonna get raped or something . . . it was just very disturbing. Just very disturbing."

With prompting from Pino, defendant explained he met Rios in late July or August. Rios bought things for defendant and acted like a father figure. Defendant estimated Rios had given him around $4,000 in the last few months. Pino suggested Rios may have given defendant money for other than fatherly reasons, but defendant denied having any kind of sexual contact with Rios.

Defendant then repeated the sequence of events with some additions. This time he said that as they were making defendant's bed (defendant slept on a bed while Rios slept on a nearby couch), Rios told defendant he loved him and wanted the best for him. A couple of hours later, defendant was texting and surfing the Web when Rios woke up and said, "Oh, my god, I just wanna be close to you." Rios pulled his pants down. Defendant said Rios had an erection and was grabbing his penis and testicles and telling defendant he had a beautiful mouth. Defendant told Rios to put his pants back on, but Rios took his pants completely off instead.

Defendant said Rios tried to touch him, and he spread his butt cheeks, and said, "'this is what I need,' and 'this is what I want.'" Rios grabbed defendant's private area, which is when defendant said he became uncomfortable and he walked out of the garage. Rios locked him outside so defendant went to Murphy to get some money for gas. Rios objected to Murphy giving defendant money, and Rios accosted Murphy. Defendant pushed Rios off Murphy and walked outside.

7

Rios grabbed a piece of metal and threw it at defendant. The metal missed defendant, but it hit his car's front windshield and hood. Defendant chased Rios back into the garage. He told Rios, "You know what, you fucked up. . . . What the fuck is your problem? You're in deep shit . . . ." Defendant said he put Rios in a choke hold, but Rios twisted around, hit defendant in the face, and broke free.

Defendant walked out of the garage, but Rios grabbed a cinder block, threw it at defendant, and hit defendant in the side. Defendant said, "fuck this shit" and hit Rios in the face three times. Rios fell back and hit his head on the floor. Defendant said he "just left because [he] thought for me to leave because I knew if he got up, he would still be trying to, um, throw stuff at me . . . ." Defendant said he called the police because he thought Rios might need an ambulance.

Defendant said he did not return to Rios's home because Rios had threatened him before, and because defendant "had had enough . . . ." Defendant said he started to regret everything because he did not want to hurt Rios, and he said, "I just hope that he's all right and that he can forgive me some day." Defendant denied ever having homosexual sex. In fact, he said Rios's actions surprised him because he and Rios had talked on numerous occasions about having sex with girls.

*e. Postarrest Statement*

That afternoon, Pino arrested defendant and advised him of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436). Defendant acknowledged and waived his rights and gave a statement.

Defendant denied having a sexual relationship with Rios and said "[i]t was just kind of a like a mental thing." He said Rios got drunk and made "drastic" sexual advances toward him. Defendant admitted he had kissed and hugged Rios before, but "just to make [Rios] feel better."

According to defendant, Rios had been upset because defendant arrived much later than expected. Rios then made sexual advances. Defendant tried to get

8

money from Murphy, but Rios got upset. Rios threw a piece of metal at defendant and hit defendant's car. Defendant grabbed Rios in a choke hold. Rios got away and socked defendant. When defendant tried to leave again, Rios threw a cinder block at defendant's car and hit defendant's face and side. Defendant grabbed Rios, hit him three times, and knocked him to the ground. Defendant thought Rios had been knocked out.

Defendant asked Pino what would happen to him, and Pino asked what defendant thought should happen to him. Defendant replied, "Like depending on the degree of the crime, obviously. [¶] . . . [¶] Like . . . you know, there's always intent, motive . . . for me, um, I'm just very confused. It all happened way too fast. And whatever happened, like, I told you . . . ." Pino said he found it "interesting" defendant had not yet asked about Rios. Defendant said he thought Rios "got damaged." Defendant admitted hitting Rios and causing Rios to fall backwards. He admitted Rios hit his head on the ground. Defendant said Rios caused everything and defendant just reacted to him.

### f. December 15 Statement

The following day, defendant, now incarcerated, agreed to talk to Pino. Pino readvised him of his *Miranda* rights, and defendant gave a similar account of his fight with Rios as in his other statements. Pino also told defendant Rios's autopsy results were not consistent with defendant's story. Pino mentioned the pathologist did not believe a human fist caused Rios's injuries. Defendant denied striking Rios with anything other than his hands, and he claimed to have hit Rios solely in the face. Defendant did admit he and Rios were "rolling on the ground" at one point.

### g. Defendant's Cell Phone and Computer

After defendant's arrest, Pino seized his cell phone. Defendant gave Pino permission to search his cell phone and gave him the password to unlock it. Pino asked defendant if he had any "pornographic stuff" on his phone, and defendant said he downloaded one pornographic movie, and he had taken some pictures of his penis.

Police also found some text messages from Rios to defendant. For instance, the day before the murder, Rios texted the following to defendant: "I do raly Love tha fancy face did U make wen I'm stick my DIC on Ur Ass . . . I'll never forget." On the day of the murder, defendant wrote but did not send the following text: "I fucked some fool up dirty - F-O - cuz when I knocked him, I was still beating on him like the devil. I slit M-T knuckles and got my lip busted. This happened like 30 minutes ago fool."

Buena Park Police Department located defendant's Cadillac in Rialto a few hours after the murder. Officers searched defendant's car pursuant to a warrant. Inside the car, the officers found some items of defendant's clothing and two receipts for MoneyGrams. One of the receipts proved Rios recently sent a MoneyGram to defendant.

Also pursuant to a warrant, Buena Park police officers searched defendant's Victorville home. One of the items seized was his computer. A forensic search of defendant's computer found about 200 images of heterosexual pornography, 550 images of homosexual pornography, between four and six homosexual pornographic videos, and about 10 heterosexual pornographic videos.

*h. Autopsy*

At the time of his death, Rios was 47 years old, five feet, seven inches tall, and he weighed about 144 pounds. A medical examiner testified the cause of Rios's death was blunt force trauma. The medical examiner identified multiple fractures to Rios's nose, multiple fractures in the suborbital area above his right eyebrow and his right cheekbone, and multiple fractures to his lower left jaw. In the medical examiner's opinion, Rios's injuries could not have been inflicted by the force of a human hand or by that of a simple fall. To the contrary, the examiner testified Rios's injuries were likely to have been caused by a person of roughly defendant's height and weight driving Rios's face into concrete.

10

The examiner also found signs of asphyxiation or strangulation, multiple rib fractures, and multiple areas of trauma to the back of Rios' left hand, the palm of his right hand, and to his left knee. Rios had a blood-alcohol level of .17 percent.

### i. *Miscellaneous Facts*

DNA testing was performed and samples collected from a cement cinder block and Rios's hands. DNA from three individuals was found on the cinder block. Rios could not be excluded as a major contributor to the DNA on the cinder block. Defendant was excluded as a major contributor. However, defendant could not be excluded as a contributor to DNA found on swabs from Rios's right fingernails.

*Defense Evidence*

Fabian Heredia Alvarado testified he met Rios when Rios rented a room in a trailer behind Alvarado's brother's house. Alvarado was between 19 and 20 years old at the time. One night, a drunken Rios groped a sleeping Alvarado's testicles. Alvarado threatened to call the police and Rios threatened to have Alvarado's visa taken away. Rios tried to touch Alvarado another time, but Alvarado pushed him away. A third time, Rios asked Alvarado for help. Alvarado put cream on Rios's back to relieve Rios's back pain, but Rios started to take his clothes off and tried to close the door. Alvarado walked out when Rios removed all of his clothing. Alvarado said Rios promised to buy things and give him money in exchange for sex. When Alvarado refused, Rios became violent, kicking the walls and throwing objects.

## DISCUSSION

The prosecution argued defendant committed either first or second degree murder, and defendant asserted self-defense. Defendant argued Rios created a situation where defendant either actually and reasonably, or actually and unreasonably, believed Rios would inflict bodily injury or rape him, and defendant used reasonable force to stop Rios from causing him great bodily injury or raping him. In this way, defendant maintained he was guilty only of involuntary or voluntary manslaughter.

11

*1. Evidentiary Error*

        *a. Homosexual Pornography*

        Prior to trial, defendant moved to exclude under Evidence Code section 352 evidence of pornographic material found on his computer. The prosecutor argued defendant's possession of homosexual pornography was relevant to his credibility with respect to his self-defense claim. The court concluded Pino's testimony was relevant to defendant's credibility and was not unduly prejudicial.

        On appeal, defendant claims the court abused its discretion by admitting evidence of pornographic material found on his computer. He asserts the court violated Evidence Code sections 350, 352, and 1101, subdivision (a), deprived him of due process of law, and violated his First Amendment right to freedom of expression. We disagree.

        We review a court's rulings under Evidence Code section 352 for abuse of discretion. "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004; see *People v. Kipp* (2001) 26 Cal.4th 1100, 1124-1125.)

        Defendant repeatedly expressed disgust at Rios's sexual advances conduct and denied any interest in participating in homosexual acts. Thus, evidence defendant possessed homosexual pornography was relevant. It suggested defendant had a certain familiarity with and interest in homosexual behavior, which in turn questions the notion he was repulsed by Rios's overtures to the point of killing him. More specifically, defendant's possession of homosexual pornography was relevant to his credibility as a hearsay declarant because it had some tendency in reason to prove or disprove his veracity on these points. (Evid. Code, §§ 210, 350, 351.) Furthermore, the prosecution was permitted to impeach defendant with this evidence under Evidence Code section 1101, subdivision (c). (See *People v. Doolin* (2009) 45 Cal.4th 390, 438-439.)

Moreover, defendant has not demonstrated the admission of evidence he possessed homosexual pornography was unduly prejudicial. "'"'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" [Citation.]'" (*People v. Doolin*, *supra*, 45 Cal.4th at p. 439.)

In his reply brief, defendant cites this court's observation in *People v. Garcia* (2014) 229 Cal.App.4th 302, that despite recent social progress, "evidence and argument regarding appellant's sexual orientation was still potentially inflammatory," and in a case of child molestation, irrelevant as evidence of intent or motive. (*Id*. at p. 315.) We have no issue with *Garcia*. It is simply inapplicable here.

In sum, defendant has not demonstrated the court abused its discretion. There was nothing arbitrary, capricious, or patently absurd about the court's ruling, and it resulted in no manifest miscarriage of justice. Rather, the court carefully weighed the probative value of evidence defendant possessed homosexual pornography against its potential for undue prejudice, and correctly concluded the evidence should be admitted.

Finally, defendant also claims the court's ruling violated his right to due process of law and his right to view artistic works as protected by state and federal constitutional guarantees to free speech. He asserts, "Since the issue to be decided here implicates First Amendment rights, this court should apply independent, de novo review. [Citation.]" And, he discusses, at length, cases in support of this assertion. We are unmoved. The ordinary application of state evidentiary law does not, as a general matter, implicate the United States Constitution. (*People v. Kraft* (2000) 23 Cal.4th 978, 1035-1036.) None of defendant's arguments, nor the authorities upon which he relies, provide cause to forego application of the general rule here. This case simply does not involve defendant's right to free speech, nor his freedom to view artistic content.

*b. Evidence of Rios's Sexual Aggression*

As noted, Alvarado testified to Rios's propensity for sexual aggression toward young men. Prior to trial, the defense sought to introduce a second witness's testimony on this topic. According to the defense offer of proof, in 2004, Rios got drunk and openly masturbated in front of the witness. Then, Rios entered the bathroom while the witness was taking a shower.

The court concluded the 2004 incident was remote in time and marginally relevant because Rios had not exhibited any overt sexual aggression. Defendant claims the trial court abused its discretion and violated his right to due process of law and a fair trial by excluding evidence of the 2004 incident. We disagree.

According to the record, the court carefully considered the remoteness of the 2004 conduct and the nature of the acts defendant was alleged to have committed. The court correctly noted the 2004 incident was markedly dissimilar to the charged crimes because the 2004 incident did not involve the type of sexually aggressive conduct defendant claimed Rios engaged in with him, or the type of conduct Alvarado testified about at trial. With seven years between the 2004 incident and the instant crimes, and in light of the dissimilar nature of the conduct involved, we conclude the court properly excluded evidence of the 2004 incident. As noted, the trial court's latitude to admit or exclude evidence under Evidence Code section 352 is broad. (*People v. Kipp*, *supra*, 26 Cal.4th at p. 1124.)

2. *Instructional Error*

*a. Voluntary Manslaughter, Involuntary Manslaughter, Excessive Force*

The court instructed the jury on homicide (CALCRIM No. 500), justifiable homicide under self-defense or defense of another (CALRICM No. 505), first and second degree murder (CALCRIM Nos. 520, 521), provocation reducing murder to manslaughter (CALCRIM Nos. 522, 570), voluntary manslaughter based on imperfect self-defense

14

(CALCRIM No. 571), and involuntary manslaughter as a lesser included offense to murder (CALCRIM No. 580).

Defendant challenges the adequacy of the court's instructions on voluntary and involuntary manslaughter. Our review of the adequacy of jury instructions is based on whether the trial court fully and fairly instructed on the applicable law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving or not giving jury instructions, an appellate court *must consider the instructions as a whole and assume jurors are intelligent persons capable of understanding and correlating all given instructions.* (*Ibid.*) The ultimate question is whether there is a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220.)

Defendant first argues the court had a duty to instruct the jury he could be found guilty of voluntary or involuntary manslaughter if the jury concluded he used excessive force in reasonable or unreasonable self-defense. In support of his contention, defendant cites the following passage from *People v. Clark* (1982) 130 Cal.App.3d 371: "The principles of self-defense are founded in the doctrine of necessity. This foundation gives rise to two closely related rules which are applicable in this case. First, only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified. [Citation.] Second, deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury; thus '[a] misdemeanor assault must be suffered without the privilege of retaliating with deadly force.' [Citations.] Under these two principles a person may be found guilty of unlawful homicide even where the evidence establishes the right of self-defense if the jury finds that nature of the attack did not justify the resort to deadly force or that the force used exceeded that which was reasonably necessary to repel the attack. [Citations.]" (*Id.* at p. 380, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 92.)

15

We find defendant's arguments untenable. In the first place, voluntary manslaughter based on use of excessive force in self-defense is not a separate theory from voluntary manslaughter based on imperfect self-defense. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 777.) Where a person uses excessive force in self-defense, malice is negated only if defendant *honestly but unreasonably* believed the degree of force used was in fact necessary. (*Ibid.*) By virtue of CALCRIM No. 571, the jury was adequately instructed on what to do if they found defendant used excessive force in self-defense. There was no need for further instructions on imperfect self-defense.

Besides, under *People v. Blakely*, *supra*, 23 Cal.4th at page 91, when a person acts with conscious disregard for life and unintentionally kills in unreasonable self-defense, the killing is voluntary, not involuntary manslaughter as defendant contends. Pursuant to CALCRIM No. 580, the court instructed the jury that in order to find defendant guilty of involuntary manslaughter it had to conclude he killed Rios without the intent to kill and without conscious disregard for the risk to human life he created. This instruction is a correct statement of the law and nothing more was required.

Because the instructions given on voluntary and involuntary manslaughter were correct and adequate, we need not address defendant's ineffective assistance of counsel claim for not requesting a modification of or additions to the jury instructions on voluntary and involuntary manslaughter.

b. *Voluntary Manslaughter and the Burden of Proof*

Defendant also contends the instructions on voluntary manslaughter (CALCRIM Nos. 522, 570 & 571), impermissibly shifted the burden of proof from the prosecution to the defense. Specifically, he asserts that while these instructions correctly state the law, the repeated references to provocation *reducing* murder to manslaughter contained in those instructions somehow "explicitly state[] that homicide is murder unless the defense convinces the jury it should be 'reduced' to voluntary manslaughter." Again we disagree.

16

The correctness of jury instructions is based on the whole charge to the jury, not just selected parts of one or more instructions. (*People v. Patterson* (1979) 88 Cal.App.3d 742, 753.) Here, the court gave the standard reasonable doubt instruction, which states the burden of proof (beyond a reasonable doubt) and identifies the prosecution as the party who must sustain that burden, and instructions on the various forms of homicide, many of which repeatedly state the People have the burden of proving all elements of the charged crimes beyond a reasonable doubt.

There is no reason to assume, as defendant does, that the jurors disregarded all instructions to the contrary and believed defendant had the burden of proving murder should be reduced to manslaughter. In fact, we must "assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." (*People v. Mills* (1991) 1 Cal.App.4th 898, 918.) Thus, there was no error.

### c. False Statements and Flight

The court gave CALCRIM Nos. 362 (consciousness of guilt - false statements) and 372 (flight). As given, these instructions were correct statements of the law and applicable to the facts of this case. Even so, defendant argues these instructions violated his right to due process of law because they "embody irrational permissive inferences in violation of due process." (Capitalization omitted.)

However, as the Attorney General points out, the California Supreme Court rejected nearly identical arguments in *People v. Page* (2008) 44 Cal.4th 1, 50-52 and *People v. Mendoza* (2000) 24 Cal.4th 130, 179. Defendant acknowledges these cases and mounts no serious challenge to their applicability here. And in any event, we are bound by the California Supreme Court's decisions on this point. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455). Once more there was no error.

17

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.