*Aaron Scott Vangorder v. State of Maryland*, No. 172, September Term, 2024. Opinion by Eyler, J. Filed June 2, 2025.

**CRIMINAL LAW – SEXUAL OFFENSES AGAINST MINORS**

After a jury trial in the Circuit Court for Wicomico County, Aaron Scott Vangorder, appellant, was found guilty of sexual abuse of a minor by a household member, § 3-602(b)(2) of the Criminal Law ("CR") Article of the Maryland Code; sexual abuse of a minor (other than rape and incest) by a person having temporary supervision, CR § 3-602(b)(1); two counts of third-degree sexual offense, CR § 3-307; two counts of fourth-degree sexual offense, CR § 3-308(b)(1); three counts of second-degree assault, CR § 3-203; and sexual solicitation of a minor, CR § 3-324. Appellant was acquitted of two other charges, one count of third-degree sexual offense and one count of fourth-degree sexual offense.

**HELD**: The trial court erred in admitting evidence of appellant's sexual orientation. Evidence of sexual orientation is irrelevant in child sexual abuse cases when the child is pre-adolescent and when, as here, there is no evidence linking sexual orientation with child abuse. Although the convictions are reversed, for purposes of any retrial, the evidence is legally sufficient to sustain the convictions.

Circuit Court for Wicomico County
Case No.: C-22-CR-23-0342

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 172

September Term, 2024

_____

AARON SCOTT VANGORDER

v.

STATE OF MARYLAND

_____

Shaw,
Zic,
Eyler, James R.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Eyler, J.
_____

Filed: June 2, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

After a jury trial in the Circuit Court for Wicomico County, Aaron Scott Vangorder, appellant, was found guilty of sexual abuse of a minor by a household member, § 3-602(b)(2) of the Criminal Law ("CR") Article of the Maryland Code; sexual abuse of a minor by a person having temporary supervision, CR § 3-602(b)(1);[1] two counts of third-degree sexual offense, CR § 3-307; two counts of fourth-degree sexual offense, CR § 3-308(b)(1); three counts of second-degree assault, CR § 3-203; and sexual solicitation of a minor, CR § 3-324. Appellant was acquitted of two other charges, one count of third-degree sexual offense and one count of fourth-degree sexual offense. Appellant was sentenced to incarceration for a total of twelve years,[2] was ordered to register as a Tier III sex offender, and was subject to lifetime supervision as a sexual offender. This timely appeal followed.

## QUESTIONS PRESENTED

Appellant presents the following three questions for our consideration:

I. Did the trial court both err and abuse its discretion in admitting evidence of [a]ppellant's sexual orientation?

II. Was the evidence legally sufficient to support the convictions for sexual abuse of a minor (temporary supervision) and solicitation of a minor?

III. Did the trial court commit plain error in admitting prejudicial evidence about why [the minor] did not immediately report the abuse?

---

[1] The counts were based on sexual offenses other than rape and incest.

[2] The court imposed the following sentence: on count one, sexual abuse of a minor by a household member, incarceration for ten years; on count three, third-degree sexual offense, a term of two years consecutive to count one; on count four, third-degree sexual offense, a term of two years concurrent to count three; on count nine, second-degree assault, two years concurrent with count one; and, on count ten, sexual solicitation of a minor, two years, concurrent with count one. The remaining counts merged for sentencing purposes.

For the reasons set forth below, we shall reverse appellant's convictions and remand the case to the Circuit Court for Wicomico County for a new trial.

**FACTUAL BACKGROUND**

In July 2023, W.W., who was born on January 17, 2011, lived in a three-bedroom, two-bathroom home in Pittsville, Maryland, with his mother, K.H., his mother's fiancé, W.A., his brothers W and C, and his sister M. W.A. owned a dirt track race car. He purchased parts for the race car and had it serviced at a shop in Laurel, Delaware. At one time, the shop was owned by appellant's father and appellant worked there. At some point in or about 2021, appellant began running his father's business. Appellant worked on W.A.'s car and, in addition, helped load and unload the car, made sure it was "set up" correctly, and went to the track where he hung out with K.H. and W.A.'s family, including W.W.

A personal friendship developed between the family and appellant, whom they referred to as "Cupcake." Appellant went to family functions, holiday parties, and the homes of some of the family's friends. Although appellant had his own residence in Delaware, beginning in about 2021, he began staying at the family's home on a regular basis from Thursdays through Mondays. At the family home in Pittsville, K.H. and W.A. slept in one bedroom, M had her own bedroom, and C, W, and W.W. shared a bedroom. Sometimes appellant slept on the bottom bunk of C's bunkbed but usually he slept on a sofa in the living room. Appellant had a key to the family's home, ate meals with the family, watched the house, and cared for the family's pets when they were on vacation. He was

2

included in the family's Life360 app, which tracked the cell phones of family members. On ten to twelve occasions, appellant babysat the children.

Appellant spent more time with W.W. than with the other children. W.W. thought of appellant as a friend and as part of his family and sometimes called him "uncle." Appellant took W.W. to the home of one of his friends, to racetracks in New Jersey, to a hockey game in New Jersey, out to dinner, go-karting, and to Ocean City. According to W.A., "[l]ike, every weekend they would go somewhere."

On school nights, the children slept in their own bedrooms, but on weekends and in the summer, they were permitted to watch television and sleep in the living room which had a sofa with an attached chaise and another sofa that, together, formed an "L" shape, and a chair. On the night of July 2, 2023, W.W. and appellant returned from "somewhere" at about 11:30 p.m. C and W were already in the living room watching a movie and W.W. and appellant joined them. C was on the chair and W, appellant, and W.W. were on the couch. W and W.W. were lying with their heads side-by-side, with W on the inside of the couch. W, who was five years old at the time, fell asleep on the couch. Appellant and W.W., who were awake, continued watching the movie. Appellant's head was "right next to" W.W.'s feet and W.W. was under a blanket and lying face down.

At some point while they were watching the movie, appellant started to lick W.W.'s toes and put them in his mouth. W.W. testified that this lasted for "[l]ike, ten minutes maybe[,]" but on cross-examination he said it lasted for five minutes. W.W. was "shocked" and "was processing it." Appellant then started "rubbing" W.W.'s "butt" over and then under his clothes. Appellant's hand went up the bottom of the leg of the shorts W.W. was

3

wearing. W.W. testified that this touching lasted about three minutes. While this was happening, W.W. was "shaking a little bit[,]" "trying to move around[,]" and thinking "what's happening[?]" At one point, W.W. got up and went to the bathroom "just to, like, think[.]" After throwing some water on his face, he returned to the couch and rested on his side. At that point, appellant asked W.W., "[c]an I keep going?" W.W. said no, but appellant continued to touch his butt under his clothing for four to five minutes. Appellant also started "grabbing around" W.W.'s penis and "flicked" his penis.

About thirty seconds after appellant started touching W.W.'s penis, K.H. and W.A. came out of their bedroom and walked into the kitchen. This occurred between 12:30 and 1:30 a.m. W.A. saw appellant, W.W., and W on the couch in the living room watching a movie. Appellant "sat up real fast[,]" "jumped real quickly" and "kind of scooted through the kitchen to the laundry room." K.H. did not think anything of that because she had put appellant's laundry in the dryer, and she assumed that he was going to check on it. Thereafter, K.H. and W.A. returned to their bedroom and appellant returned from the laundry room. W.W. changed positions on the couch so that he was lying face down again. Appellant started to rub W.W.'s butt again, but did not touch his penis after K.H. and W.A. returned to their bedroom. At some point, W.W. pushed W into the crevice of the couch to "protect him" because he did not want him to "get touched or anything." W.W. fell asleep on the couch.

W.W. testified that he did not tell his parents what appellant was doing because appellant's "fishing bag was, like, right there, and then there was, like, a knife in his fishing bag, and I didn't, like, want, like, anybody to, like, do something to hurt anybody else or

4

anything like that." W.W. explained that appellant "could have like, hurt me or, like, my dad or mom could have, like, hurt him."

The following morning, when K.H. woke up, appellant was gone. W.W. told his mother he needed to speak with her. W.W. told her "everything that happened." He said that the night before, appellant was "sucking on his toes" and had felt underneath the blanket all over his bottom and around to his penis. W.W. asked him to stop, but he would not. W.W. reported that appellant stopped when K.H. and W.A. went into the kitchen, but he started doing "that stuff" again when they went back to their bedroom. W.W. reported that he pushed his baby brother, W, into the crack of the sofa to make sure appellant was not touching him. K.H. asked W.A. to come into their bedroom, and W.W. repeated what had happened to him.

K.H. and W.A. decided to retrieve their race car from appellant's shop and then take W.W. to the police to report what had happened. When they arrived at the shop, appellant was not there, but as they were packing up their belongings, he arrived. Appellant kept asking them, "[i]s everything okay" and why K.H. was mad at him. W.A. told appellant to get away from them and appellant responded by saying, "I just wish I knew what I've done[.]" K.H. "got in his face" and asked him, "[w]hy don't you tell us what you did?" Appellant "just looked down and started crying." W.A. said, "[l]ook, just leave us the eff alone, let us get our car." Later, K.H. learned that appellant had texted W.W. that day saying that he was coming to get him to go get new fishing rods. W.W. testified that appellant sent him a "drag strip video and something about fishing."

5

After retrieving the race car, K.H. and W.A. went home, picked up W.W., and took him to the Wicomico County Sheriff's Office. K.H. was asked to bring W.W. to the Child Advocacy Center where he was interviewed by Erica Pierce, a social worker employed by the Wicomico County Department of Social Services. During the interview, W.W. said, among other things, that appellant "turned the movie off and he started to touch [W.W.] inappropriately" under the blanket and under his clothes, on his "butt" and "pelvis." Later, W.W. clarified that appellant grabbed his penis and was "flicking it back and forth." W.W. said that even after he asked appellant not to do that, he "kept doing it anyway." W.W. testified at trial that everything he told Pierce was true. The interview was video- and audio-recorded. Over objection, a copy of that recording and a transcript of the interview were admitted in evidence, and the recording was played for the jury.

The interview was observed from a separate observation room by Detective Dan Schultz from the Wicomico County Sheriff's Office. Detective Schultz was assigned W.W.'s case on July 3, 2023. After observing W.W.'s disclosure during the interview with Pierce, Detective Schultz identified appellant as a suspect. On July 7, 2023, Detective Schultz and another detective went to appellant's place of employment in Delaware and spoke with him. That encounter was recorded on Detective Schultz's body-worn camera. Appellant was advised that the encounter was being recorded, he was not under arrest, and was free to go at any time. Appellant agreed to be interviewed. The video recording of that interview and a transcript of it were admitted in evidence.

Appellant provided his date of birth, which was October 6, 1990. He told the detectives that when he was "laying down" on the couch at W.W.'s home, "something kept

6

touching [his] face, so [he] just kind of pushed it away." He said that when he stretched, he felt something and asked, "what the hell was that" "because it felt weird." Appellant did not think it was W.W.'s penis. W.W. responded that it was his thumb. Appellant said that W.W.'s response was "kind of odd," and asked if he was "sure." Later in his conversation with the detectives, the following exchange occurred:

> [DETECTIVE SCHULTZ]:  Okay. But why is [W.W.] saying that you guys actually talked about it?
>
> [APPELLANT]:  Because I asked – I said what was that and he said – and then he finally told me what it was, I'm like that didn't make sense.
>
> Q.  Okay. So he told you what it was, what did you say after that?
>
> A.  But I didn't – I said man, I'm sorry, I didn't mean that is what I said.
>
> Q.  So what'd he tell you, did he say hey, that was my penis?
>
> A.  Yeah.
>
> Q.  Okay. So –
>
> A.  But it wasn't on purpose, I am telling you it was not on purpose.
>
> Q.  Okay. So – so what I'm getting now is you did touch it, but it wasn't on purpose. Because you see where we're going, we're getting –
>
> A.  Yeah, yeah.
>
> Q.  – closer to the middle, we're getting there, because at first you wanted to stick with the thumb story.
>
> A.  That's what he told me it was –
>
> Q.  But you're –
>
> A.  – originally.

Q. Yeah, but you had more information you were – so that – so that makes me think what other information is there here, do you know what I mean? How – because now we're getting closer to that center.

A. Yeah.

Q. And now we're getting closer also to saying that [W.W.] did not lie because he – you just said – you just said what he said, okay?

A. Yeah.

Q. So – so why didn't – I got to ask that, why didn't you say that right at the first off?

A. Because it's not something I want to talk about, I didn't mean to do it.

Q. Okay.

A. It wasn't on purpose.

Appellant told the detectives that normally W.W. wore gym shorts and that the touch "happened through the pants." He denied "touching his butt ever" except for when they "used to play around, just like – like, pinching each other, that was it." Appellant said, "I don't grab it like sexually." When asked if his hand might have gone up W.W.'s shorts, appellant said, "[n]ot then, not as far as I know, maybe across the front, if that" and "[i]f you're stretching you're not going up the pants." He denied touching W.W. under his clothing, saying "I didn't[,]" "[n]ot that I know of." He also denied flicking W.W.'s penis. The only contact was with the back of his hand while he was stretching. Appellant said that he was "not saying [W.W.'s] lying" but he never touched "a bare penis[.]" Appellant said that normally when he and W.W. were on the couch, they would be "feet to feet," but "that night [he] fell asleep standing up" and "fell over" so that when he awoke, he was on his side and W.W.'s feet were "towards" him.

8

K.H. testified that W.W.'s behavior changed in the weeks following the event. He did not want anything to do with fireworks on July 4th or W.A.'s birthday celebration on July 5th. He was not eating as he normally would and did not want to play with neighborhood children. About two months after the event, K.H. received calls from W.W.'s teachers about his behavior and that he was not able to focus.

We shall include additional facts as necessary in our discussion of the questions presented.

## DISCUSSION

### I.

Appellant contends that the trial court both erred and abused its discretion in admitting evidence of his sexual orientation. The State agrees. We are not bound by that concession, but as explained herein, we agree with the State.

Appellant moved *in limine* to preclude the State from adducing evidence of his sexual orientation on the ground that the probative value of such evidence was outweighed by its prejudicial nature. The State disagreed, arguing that the jury could use evidence of appellant's sexual orientation to infer that he acted with the requisite intent and for the purpose of sexual gratification. In considering the motion, the court took note of the fact that, during *voir dire*, the potential jurors were asked whether they had strong feelings regarding individuals who identified as bisexual or homosexual, and there was no response. The court also noted that appellant had explained any touching of W.W. as an accident. Ultimately, the court denied the motion *in limine*, stating:

9

The jury is going to be called upon to decide whether this was an intentional touching or an accidental touching, and therefore the sexual orientation of the Defendant could be relevant to his intent, and as set forth in the State's answer, it would be relevant for the reasons set forth in the State's answer.

And while it would be potentially prejudicial, I do not believe it would be more prejudicial than probative having done the weighing, and it's going to be limited, and it's going to be based on the personal knowledge of a person who is going to testify that the Defendant made those statements.

Thereafter, on direct examination, over appellant's objection, K.H. testified that her family members began referring to appellant by the nickname "Cupcake" "because he kind of went both ways, with men and women[,]" and explained that she was talking about his sexuality. She explained that they "used it just as a joke between all of [them] as far as cupcakes with sprinkles and things like that, how we acted with him – how he acted sometimes as far as men or women." K.H. also testified that about six months into their friendship, appellant was "just talking about a gentleman and said – pretty much came out and told [them] that he went both ways." Both W.A. and W.W. also testified that their family members called appellant "Cupcake."

In closing argument, the State referred to the testimony about appellant's sexual orientation, stating:

> You've heard evidence of [appellant's] sexual orientation. [K.H.] said, you know, one time he – in speaking about gentlemen – I think she put it – he said he goes both ways. The way in which he's rubbing, touching [W.W.], it can only be for sexual gratification. For his own needs, he did those things to [W.W.]

> \*          \*          \*

> And, again, sexual contact means intentional touching for an intimate area or genital area – in this case, the penis and butt are both of those – for

10

purposes of sexual arousal or gratification or for the abuse of either party. Again, there's no other reason he was doing what he did. He repeatedly asked [W.W.] if he could touch him. And you have evidence of his sexual orientation. The intent is there for sexual arousal and gratification, and the manner in which he was touching him: Rubbing, the playing, flicking, all of those things for arousal and gratification.

Later in closing argument, the prosecutor also referred to appellant as "Cupcake."

Appellant argues that evidence of his sexual orientation was irrelevant, and in any event, the court abused its discretion in determining that the relevance of that evidence outweighed its prejudicial effect. He is correct.[3]

### *Standard of Review*

Under Maryland Rule 5-402, "[e]xcept as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible. Evidence that is not relevant is not admissible." Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401; *see also Merzbacher v. State*, 346 Md. 391, 404 (1997) ("To be relevant, evidence must tend to establish or refute a fact at issue in the case."). A trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5-403. Probative value is substantially outweighed by

---

[3] The State concedes that the issues were preserved by general objections during trial.

11

unfair prejudice when the evidence "'tends to have some adverse effect . . . beyond tending to prove the fact or issue that justified its admission.'" *State v. Heath*, 464 Md. 445, 464 (2019) (quoting *Hannah v. State*, 420 Md. 339, 347 (2011)).

Our review of the trial court's decision to admit evidence involves a two-step analysis. First, we determine whether the evidence was relevant, which is a conclusion of law that we review *de novo*.[4] *Montague v. State*, 471 Md. 657, 673 (2020) (citing *Portillo Funes v. State*, 469 Md. 438, 478 (2020)). "While trial judges are vested with discretion in weighing relevancy in light of unfairness or efficiency considerations, trial judges do not have discretion to admit irrelevant evidence." *State v. Simms*, 420 Md. 705, 724 (2011). If we determine that the evidence in question was relevant, we proceed to the second step, which is whether the court abused its discretion in admitting the evidence. *Williams v. State*, 457 Md. 551, 563 (2018) ("[T]he circuit court's decision to admit relevant evidence is reviewed for an abuse of discretion."); *Montague*, 471 Md. at 673-74 ("[W]e consider whether the trial court abused its discretion by admitting relevant evidence which should have been excluded as unfairly prejudicial."). "An abuse of discretion occurs where no

_____

[4] The Maryland Supreme Court recently engaged in a lengthy discussion revealing a lack of consensus within the Court regarding the appropriate standard of review for questions of relevance. *See Akers v. State*, 490 Md. 1, 24 n.11, 70 n.10 (2025) (Gould, J., dissenting). The majority used a two-part analysis requiring that relevance be reviewed *de novo*. *Id.* at 24 & n.11 ("First, we determine whether the evidence was relevant, which is a conclusion of law that we review de novo." (citing, among other cases, *Montague v. State*, 471 Md. 657, 673 (2020))); *Portillo Funes v. State*, 469 Md. 438, 478 (2020) ("An appellate court reviews de novo a trial court's determination as to whether evidence is relevant."); *Ford v. State*, 462 Md. 3, 46 (2018) ("An appellate court reviews without deference a trial court's conclusion as to whether evidence is relevant."); *Santiago v. State*, 458 Md. 140, 161 (2018) (noting that the consideration of whether evidence is legally relevant is reviewed for legal error).

12

reasonable person would take the view adopted by the circuit court." *Williams*, 457 Md. at 563.

*Evidence of Sexual Orientation*

No Maryland case has addressed directly the issue of whether evidence of a defendant's sexual orientation is relevant to his or her intent to sexually abuse a minor. Recently, however, in *Turenne v. State*, 488 Md. 239 (2024), every member of Maryland's Supreme Court agreed to the proposition, albeit in *dicta*, that evidence of an adult defendant's sexual orientation either is not relevant to a defendant's sexual attraction to children or that the risk of unfairly prejudicing a defendant by reinforcing a stereotype of gay and lesbian people outweighs any potential probative value such evidence might have. *See Turenne*, 488 Md. at 274 n.16 ("[W]here the defendant is gay or lesbian and is of the same gender as the alleged victim, an attempt to make such a connection is particularly concerning, because it 'could be misinterpreted' as 'reinforc[ing] a terrible stereotype of gay and lesbian people' and 'perpetrating a pernicious falsehood about same-sex orientation." (quoting *Turenne v. State*, 258 Md. App. 224, 264 (2023))); *see also id.* at 300 n.4 (Fader, C.J., concurring and dissenting) ("I agree that identifying a connection between adult sexual orientation and any aspect of sexual attraction to children is wrong and could 'reinforc[e] a terrible stereotype of gay and lesbian people' and 'perpetrat[e] a pernicious falsehood about same-sex orientation." (quoting *Turenne*, 258 Md. App. at 264)); *id.* at 321 n.7 (Watts, J., dissenting) ("Such consideration would be improper because there is no connection between sexual orientation and sexual attraction to children, or between adult pornography and child pornography.").

13

In *Turenne*, the defendant, a daycare worker, was convicted of sexual abuse of a minor, CR § 3-602(b)(1) (stating that a person who has care "for the supervision of a minor may not cause sexual abuse to the minor"), of the sexual exploitation variety, CR § 3-602(a)(4) (stating that sexual abuse includes an act that involves sexual exploitation of a minor), and child pornography, CR §§ 11-207(a)(1) and 11-208(b)(2). The convictions arose out of eight photographs of the genitalia of nude children taken by her and stored on her cell phone. At trial, Turenne was asked, without objection, if she told a co-worker, Miller, that she was attracted to females and whether she was, in fact, attracted to women. *Turenne*, 488 Md. at 258. Turenne did not recall telling Miller that she was attracted to females and stated, "'I wouldn't say attracted to women, like, I will say, . . . like, I'm bisexual, like, I'm still confused about what I like between men or women. But not children, no.'" *Id.*

Turenne was questioned also about adult pornography that was found on her phone. "In response to being asked whether she received 'some kind of sexual gratification' from watching the adult pornography that was on her phone, Ms. Turenne testified: 'I'm kind of attracted to them but not really because, like I say, I'm still confused about what I like or not.'" *Id.* Miller testified without objection that Turenne "'was gay.'" *Id.* at 259.

In closing argument, the prosecutor stated, without objection, that Turenne told Miller that she was gay or bisexual, which "matters when you're looking at whether she had any sexual gratification for taking these pictures, holding on to these pictures for as long as she did." *Id.* With respect to the evidence of Turenne's sexual orientation, defense counsel told the jury the "State is saying that she was gay and look at the pictures and

14

they're trying to imply that because you're gay somehow you then become an abuser. . . . They're making the argument that she's gay, but she has male genitalia in these pictures. And she even said herself, I'm bisexual." *Id.* at 259-60. The prosecutor responded by saying:

> There's no inference made by the fact that she would be gay or bisexual. That's irrelevant. The only reason we're considering that is the inference that she has sexual gratification and that that connects to the pictures themselves. That's why it becomes relevant. Nobody is making any inference from it.

*     *     *

> These pictures may not mean anything to us other than just make us uncomfortable, but obviously to some people out there who are voyeurs or pedophiles, they bring a gratification and we can only infer that from the pictures themselves because the children can't tell us what her intent, and really it's hard to know what anybody's intent is, so we look at the evidence itself.

*Id.* at 260.

In this Court, among other things, Turenne asked us to grant plain error review with respect to the prosecutor's comments during closing argument and as to whether her being gay or bisexual was pertinent to whether she obtained any sexual gratification in taking the photographs and holding on to them. *Turenne*, 258 Md. App. at 261-62. We concluded that the trial court did not plainly err by allowing the prosecutor's comments about Turenne's sexual orientation. *Id.* at 263. We explained that:

> the impact of the prosecutor's comments, particularly her rebuttal, though mentioning Turenne's sexual orientation, focused on explaining Turenne's interest in female children. In other words, the prosecutor was not arguing that Turenne was probably a child abuser because she was lesbian or bisexual, but rather that her sexual attraction to women might mean that she was sexually attracted to girls – which in turn, would explain the photos she

15

took exclusively of female infants' genitalia. Though this point is debatable, it is not plainly wrong, particularly in the absence of an objection and given the substantial latitude that lawyers have in closing argument.

*Id.* at 263-64.

We went on to caution "that the prosecutor's comments could be misinterpreted. Linking one's sexual orientation, particularly a same-sex orientation, to sexually abusing children is a canard that reinforces a terrible stereotype of gay and lesbian people." *Id.* at 264. We noted that "the prosecutor's comments, though perhaps unintentional, came dangerously close to perpetrating a pernicious falsehood about same-sex orientation and should be avoided." *Id.*

Maryland's Supreme Court declined to consider issues pertaining to Turenne's sexual orientation. In a footnote, the Court explained:

> We also need not decide whether the evidence that was introduced concerning Ms. Turenne's sexual orientation supports her convictions in this case. First, our grant of certiorari was expressly limited to the first question presented, which did not raise the issue of Ms. Turenne's sexual orientation. And we declined to grant review with respect to a question concerning the sexual orientation evidence. Second, the evidence is sufficient to sustain Ms. Turenne's child sexual abuse convictions (as well as her child pornography-related convictions, as discussed below) without consideration of such evidence. However, nothing in this opinion should be construed as predetermining the outcome of any post-conviction petition that Ms. Turenne may subsequently file.
>
> A few additional observations about the sexual orientation evidence are also in order. We agree with the Appellate Court that the prosecutor was not arguing that Ms. Turenne was probably a child abuser because she was gay. *See Turenne*, 258 Md. App. at 263-54. However, both counsel seemed to be of the view that Ms. Turenne's sexual orientation could shed light on whether the photos of the children were sexual in nature and whether Ms. Turenne took them for sexual gratification. Thus, the prosecutor elicited from Ms. Miller that Ms. Turenne told her she was gay and argued to the jury: "She told [Ms. Miller] that she was gay or bisexual, which, obviously doesn't

matter, but it matters when you're looking at whether she had any sexual gratification for taking these pictures, holding on to these pictures for as long as she did." For his part, defense counsel elicited from Detective Rockwell that there was both male and female adult pornography on Ms. Turenne's phone, and argued to the jury: "There's pictures of male genitalia, too, of adult male genitalia. [The State doesn't] mention that. They're making the argument that she's gay, but she has male genitalia in these pictures."

Without data to support a correlation of this sort, litigants should avoid eliciting such evidence and making such arguments, regardless of the defendant's particular sexual orientation and regardless of the genders of the defendant and victim. However, where the defendant is gay or lesbian and is of the same gender as the alleged victim, an attempt to make such a connection is particularly concerning, because it "could be misinterpreted" as "reinforc[ing] a terrible stereotype of gay and lesbian people" and "perpetuating a pernicious falsehood about same-sex orientation." *Turenne*, 258 Md. App. at 264.

*Turenne*, 488 Md. at 274 n.16.

In *Turenne*, the convictions were based on sexual exploitation and child pornography, crimes that do not require an intent to achieve sexual arousal or gratification. *Id.* at 253-56. Here, such intent is one of the elements of the convictions for "sexual abuse" of a minor that was based on a "sexual offense in any degree[,]" "any other sexual conduct that is a crime[,]" CR § 3-602(a)(4)(ii)(3)-(4), third degree sexual offenses; and fourth degree sexual offenses. CR §§ 3-307 and 3-308 (stating that a person may not engage in "sexual contact" if the victim is under fourteen years of age and the violator is four years older or more). CR § 3-301 defines "sexual contact" as the intentional touching of the victim's genital or other intimate area for sexual arousal or gratification or for abuse of either party.

The Supreme Court's holdings did not encompass the issue of admission of sexual orientation evidence because it was not before the court. Moreover, the charges did not

require intent to seek sexual arousal or gratification. Nevertheless, the quoted passage from *Turenne* makes clear that the Court carefully considered the issue of sexual orientation and any relationship with child sexual abuse. Although *dicta*, we treat it as judicial *dicta* to which we accord greater deference than ordinary *dicta*. *See State v. Baby*, 404 Md. 220, 279 (2008) ("Unlike ordinary *dicta*, judicial *dicta* is, by definition, well-reasoned and stated only after the court has investigated an issue with care. Accordingly, courts afford judicial *dicta* greater deference than ordinary *dicta,* treating judicial *dicta* almost like holdings." (quotation marks and citations omitted)). It is unclear, however, whether the Supreme Court viewed the sexual orientation evidence as irrelevant or inadmissible because the danger of unfair prejudice outweighed its probative value and, in either event, whether the Court's comments were limited to the nature of the facts and charges before it.

As appellant points out, and we recognize, numerous courts in other jurisdictions have found that a defendant's sexual orientation is irrelevant to one's intent or motive to commit sexual child abuse and is unfairly prejudicial. In *People v. Garcia*, 177 Cal. Rptr. 3d 231 (Cal. Ct. App. 2014), the defendant was charged with sexually abusing a girl she babysat from age six to ten. *Garcia*, 177 Cal. Rptr. 3d at 233. At trial, the prosecutor attempted to show that the defendant was a lesbian and argued that her supposed attraction to women gave her a motive to sexually abuse the victim. *Id.* California's Court of Appeal held that the prosecutor's repeated attempts to make an issue out of the defendant's sexual orientation was prejudicial misconduct as it was not relevant to show her intent or motive or to any other issue in the case. *Id.* at 233, 241. The court explained:

> [B]y linking [Garcia's] sexual orientation to the issue of motive, the prosecutor essentially told the jury the reason [she] chose to victimize A.G. is because she is gay.
>
> We have grown beyond that notion. "[T]he modern understanding of pedophilia is that it exists wholly independently from homosexuality. The existence or absence of one neither establishes nor disproves the other." (*State v. Crotts* (2004) 104 Ohio St.3d 432, 820 N.E.2d 302, 306.) While there are some early cases to the contrary (see, e.g., *People v. O'Moore* (1948) 83 Cal.App.2d 586, 189 P.2d 554 [equating homosexuality with sexual perversion]), California courts have long recognized that a defendant's sexual attraction to *adults* of the same sex has nothing to do with whether they are sexually attracted to *children* of the same sex. (*People v. Giani* (1956) 145 Cal.App.2d 539, 302 P.2d 813 (*Giani*).)

*Id.* at 239-40.

In *People v. Stowe*, 231 N.E.3d 688 (Ill. App. Ct. 2022), *appeal denied*, 221 N.E.3d 321 (Ill. 2023), the defendant was charged with sexually abusing a fourteen-year-old autistic boy who was a resident at a care facility where the defendant worked. *Stowe*, 231 N.E.3d at 689. The trial court granted the State's motion *in limine* to introduce in evidence two images found on the defendant's cell phone of an adult nude man with an erection. *Id.* The State argued that the images were relevant to establish the defendant's intent to commit the alleged conduct for sexual gratification or arousal and to disprove any claim that his conduct was accidental or inadvertent. *Id.* The Appellate Court, relying in part on *Garcia*, reversed, stating that sexual orientation was not relevant to the determination of whether the defendant was sexually attracted to children. *Id.* at 697. The Court stated that the images "were, at best, probative of sexual attraction to a class of adults, and the State offered no evidence to support the further inference that sexual attraction to that class of adults is

19

probative of sexual attraction to children of any kind." *Id.* at 699. The court held that admission of the photos was an abuse of discretion. *Id.* at 701.

Other cases have reached similar conclusions. *See, e.g.*, *United States v. Gillespie*, 852 F.2d 475, 478-79 (9th Cir. 1988) (stating that evidence of defendant's homosexuality neither proved nor disproved that he committed child molestation); *Cohn v. Papke*, 655 F.2d 191, 194 (9th Cir. 1981) (noting that evidence of prior homosexual experiences had minimal probative value regarding whether plaintiff in civil rights case solicited act of prostitution and possibility of prejudicial effect of such evidence is great because jury might be influenced by biases and stereotypes); *People v. Giani*, 302 P.2d 813, 815 (Cal. Dist. Ct. App. 1956) (rejecting notion that sexual orientation had any bearing on propensity to commit sexual crimes against children); *Wessel v. State*, 968 So. 2d 634, 635 (Fla. Dist. Ct. App. 2007) (concluding that evidence of defendant's homosexuality to show intent for inappropriate touching was irrelevant and prejudicial); *State v. Bates*, 507 N.W.2d 847, 850-52 (Minn. Ct. App. 1993) (stating that a belief that homosexuals are attracted to prepubescent children is "a baseless stereotype," and evidence of defendant's sexual orientation was irrelevant to whether he was sexually interested in child victims); *State v. Crotts*, 820 N.E.2d 302, 306 (Ohio 2004) (stating that evidence of defendant's homosexuality was irrelevant to establish pedophilia and that the belief that homosexuals are attracted to prepubescent children is a baseless stereotype).[5]

---

[5] The decisions in these cases are consistent with the research by social scientists. *See, e.g.*, Tasseli McKay, Christine H. Lindquist & Shilpi Misra, *Understanding (and Acting On) 20 Years of Research on Violence and LGBTQ+ Communities*, 20 Trauma, Violence & Abuse

(continued…)

Similar to the instant case, some of the above cases involved charges in which intent was an element. Here, the State's purpose in offering evidence of appellant's sexual orientation was to argue that the jury could use that evidence to infer that he acted with the requisite intent and for the purpose of sexual gratification. We hold that evidence of sexual orientation is irrelevant in child sexual abuse cases when the child is pre-adolescent and when, as here, there is no evidence linking sexual orientation with child abuse. Reversal is required. We leave the question of relevance and questions of abuse of discretion with respect to the admission of evidence in other fact situations to another day.

## II.

Appellant contends that the evidence was legally insufficient to support his convictions for solicitation of a minor and for sexual abuse of a minor by one with temporary care or custody or responsibility for supervision of the minor.[6] He asserts that

---

665, 667-68, 672 (Dec. 2019) (reviewing 102 peer-reviewed articles and studies to find that there is no data to support that sexual minority individuals are more likely to be perpetrators of sexual abuse); Lisa DeMarni Cromer, Rachel E. Goldsmith, *Child Sexual Abuse Myths: Attitudes, Beliefs, and Individual Differences*, 19 Journal of Child Sexual Abuse 618, 632 (2010) (analyzing studies on child sexual abuse perpetrators and concluding that "[t]aken together, these studies that perpetrators, while a diverse group, are more likely to be male and heterosexual but that they vary across a number of dimensions"); *Pessimism about pedophilia*, 27 Harv. Mental Health Letter 1, 2 (Jul. 2010) (emphasizing the distinction between pedophilia and sexual orientation—"[r]oughly 9% to 40% of pedophiles are homosexual in their orientation toward children—but that is not the same as saying they are homosexual. Homosexual adults are no more likely that heterosexuals to abuse children").

[6] Although we have already determined that reversal and remand for a new trial is warranted in this case, we shall address whether the evidence was legally sufficient for double jeopardy purposes. *See Winder v. State*, 362 Md. 275, 324-35 (2001) (stating that if evidence was legally insufficient, double jeopardy bars a retrial); *Turner v. State*, 192 Md.

(continued…)

the question, "[c]an I keep going" was "purely rhetorical" and argues that the question did not constitute sexual solicitation because, at the time he asked W.W. if he could "keep going," he had already been touching W.W. for several minutes and, thereafter, continued to do so. He also maintains that the request to "keep going" did not specify the act he wished to keep doing and was "too ambiguous to qualify as a solicitation." With respect to the sexual abuse of a minor charge, appellant argues that the evidence did not show that he had temporary care, custody, or responsibility for supervising W.W. at the time he was sexually abused.[7] We are not persuaded.

### *Standard of Review*

The due process clause of the Fourteenth Amendment to the U.S. Constitution prohibits criminal convictions of any person except upon sufficient evidence of every element of the offense. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). When reviewing the sufficiency of the evidence to support a criminal conviction, we must determine, after viewing the evidence in the light most favorable to the State, if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Burlas v. State*, 185 Md. App. 559, 568 (2009) (quoting *Jackson*, 443 U.S. at 319). "We do not reweigh the evidence but simply ask whether there was sufficient evidence – either direct

---

App. 45, 80 (2010) ("'[W]hen a defendant's conviction is reversed by an appellate court on the sole ground that the evidence was insufficient to sustain the jury's verdict, the Double Jeopardy Clause bars a retrial on the same charge.'" (quoting *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988))).

[7] Appellant does not challenge the sufficiency of the evidence to sustain his conviction for sexual abuse of a minor under the household member modality.

22

*or circumstantial* – that could have possibly persuaded a rational jury to conclude that the defendant was guilty of the crime(s) charged." *Sewell v. State*, 239 Md. App. 571, 607 (2018). "If the evidence 'either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt[,]' then we will affirm the conviction." *Bible v. State*, 411 Md. 138, 156 (2009) (quoting *State v. Stanley*, 351 Md. 733, 750 (1998)). In our review, "'[w]e defer to the fact finder's opportunity to assess the credibility of witnesses, weigh the evidence, and resolve conflicts in the evidence.'" *Lindsey v. State*, 235 Md. App. 299, 311 (2018) (quoting *Neal v. State*, 191 Md. App. 297, 314 (2010)).

"Maryland has long held that there is no difference between direct and circumstantial evidence." *Hebron v. State*, 331 Md. 219, 226 (1993). "Circumstantial evidence alone is sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused." *Handy v. State*, 175 Md. App. 538, 562 (2007) (cleaned up). Such inferences "must rest upon more than mere speculation or conjecture." *Smith v. State*, 415 Md. 174, 185 (2010).

### *Analysis*

### *A. Solicitation of a Minor*

Appellant was charged with, among other things, sexual solicitation of a minor in violation of CR § 3-324.[8] The statute defines "solicit" as "to command, authorize, urge,

---

[8] CR § 3-324 provides, in relevant part:

(continued…)

23

entice, request, or advise a person by any means, including: (1) in person; (2) through an agent or agency; (3) over the telephone; (4) through any print medium; (5) by mail; (6) by computer or Internet; or (7) by any other electronic means." CR § 3-324(a). "The crime of sexual solicitation of a minor . . . has three elements: (1) solicitation; (2) of a minor or a law enforcement officer posing as a minor; and (3) to engage in a prohibited sex act." *Choudry v. State*, 231 Md. App. 656, 660 (2017).

In support of his contention that the evidence was insufficient to support his conviction for sexual solicitation of a minor, appellant directs our attention to *Poole v. State*, 207 Md. App. 614 (2012). In that case, the defendant, Poole, approached fifteen-year-old K.G. on the boardwalk, introduced himself, and gave her a business card. *Poole*, 207 Md. App. at 618. Later, Poole approached K.G. in a store and told her that earlier he had wanted to show her something. *Id.* Poole put his arm behind K.G. and led her to the back of the store. *Id.* K.G. testified that she "'just kind of went with it, because [she] didn't know what to do.'" *Id.* Poole took K.G. into a closet, shut the door, and locked it. *Id.* He then pushed her into a bathroom that was within the closet, shut the door, and locked it. *Id.* Poole tried to kiss K.G., touched her hair, put his hand in her pants, fingered her vagina,

---

(b)(1) A person may not, with the intent to commit a violation of § 3-304 or § 3-307 of this subtitle or § 11-207, § 11-303, § 11-304, § 11-305, § 11-306, or § 11-307 of this article, knowingly solicit a minor, or a law enforcement officer posing as a minor, to engage in activities that would be unlawful for the person to engage in under § 3-304 or § 3-307 of this subtitle or § 11-207, § 11-303, § 11-304, § 11-305, § 11-306, or § 11-307 of this article.

Appellant was charged with third-degree sexual offense in violation of CR § 3-307.

24

and fondled himself on the outside of his underwear. *Id.* at 619. Poole later opened the door and led K.G. out. *Id.* Thereafter, Poole sent K.G. a text message. *Id.* at 620.

Poole argued, among other things, that the evidence was insufficient to support his conviction for sexual solicitation of a minor because he did not solicit K.G. but simply did the acts he wanted to do. *Id.* at 634. We agreed because there was no evidence that Poole commanded, authorized, urged, enticed, requested, or advised. *Id.* at 635. Nothing in Poole's conduct qualified as solicitation to engage in sexual activity. *Id.*

That is not the case here. Although appellant's question, "Can I keep going?" was made after he had already touched W.W.'s butt, viewed in context, it could reasonably be interpreted as a request for him to touch that part of W.W.'s body again or, potentially, to go further and touch other parts of W.W.'s body. It is immaterial that appellant ignored W.W.'s refusal because "[t]he crime of solicitation is in the asking." *Brice v. State*, 256 Md. App. 470, 489 (2022) (quotation marks and citation omitted); *see also Monoker v. State*, 321 Md. 214, 220 (1990) ("The solicitation is complete once the incitement is made, even if the person solicited does not respond at all."). As to whether the question posed by appellant was "rhetorical," that issue goes to the weight of the evidence and was a matter for the jury to determine.

### B. Sexual Abuse of a Minor

Appellant was charged with sexual abuse of a minor by a person with temporary care or custody or responsibility for supervision of the minor under CR § 3-602, which provides:

(a)(1) In this section the following words have the meanings indicated.

(2) "Family member" has the meaning stated in § 3-601 of this subtitle.

(3) "Household member" has the meaning stated in § 3-601 of this subtitle.

(4)(i) "Sexual abuse" means an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not.

(ii) "Sexual abuse" includes:

1. incest;
2. rape;
3. sexual offense in any degree; and
4. any other sexual conduct that is a crime.

(b)(1) A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not cause sexual abuse to the minor.

(2) A household member or family member may not cause sexual abuse to a minor.

The statute does not define the phrase "responsibility for the supervision of a minor[.]" Whether a person has responsibility for the supervision of a minor is a question of fact for the jury to determine. *Anderson v. State*, 372 Md. 285, 292 (2002) (citing *Newman v. State*, 65 Md. App. 85, 99 (1985)). The State asserted that appellant had temporary responsibility for the supervision of W.W. at the time he sexually abused him. In his motion for judgment of acquittal on this charge, appellant argued:

> I do not believe that even in the light most favorable to the State there is sufficient evidence that at the time these events were alleged to have occurred that Mr. Vangorder was responsible for the supervision of the child. I think the testimony was that both parents were in the house, arguably two feet away on the other side of a wall. There was a number of teenaged – teenaged children, siblings who were in the house, so I don't know that there's evidence that Mr. Vangorder had any caretaking responsibility at this time, other than being an invited guest. So I would ask for motion for judgment of acquittal on that count for that reason.

The trial court denied the motion for judgment of acquittal, stating:

> So the determination of whether a person has responsibility for the supervision of a minor where the inference could go either way, I believe it should be left to the sound discretion of the jury. And although I understand the Defendant's argument, and it is a very – it is a very interesting argument,

26

I believe that a reasonable trier of fact could find that but for the fact that he, meaning Mr. Vangorder, was an entrusted member of the family, in essence they adopted him as part of their family unit, that he would not have been left with the children but for the fact that they considered him to be a caretaking adult as opposed to, like, a renter or somebody who, you know, was just a casual overnight guest, that the Defendant himself placed himself in a position to be considered thusly by them, and so it would have been an implicit extension of the understanding that when you're alone with the children, you are acting as an in loco parentis figure toward them, and he accepted that designation within the family.

I'm sorry there is no case law to further elicit – fill out the nature of that argument when a parent or guardian is immediately present in the vicinity. They weren't immediately present in the room where these events occurred, and so for those reasons, I'll deny your motion as to Count 2 of the charging document, temporary supervision.

At the close of all the evidence, appellant renewed his motion for judgment of acquittal and it was denied. Thereafter, in closing argument, the State stated:

Count 2 of sexual abuse of a minor. Instead of household member, the only difference is that he had temporary responsibility for the supervision of [W.W.] And, again, he had temporary responsibility due to the way in which he was essentially a part of this family unit. He was able to ingratiate himself in this family. He was seen as another parental figure, a family member. [W.W.] called him uncle. You know, kids call him uncle. He was permitted to sleep out on the couch, sleep in their home, do laundry, had a key, watched them, babysit them on occasion, take [W.W.], he took him out of state sometimes, go to glow races, take him to activities, do things with him.

He was another member of this family, and due to that nature, that connection, he had temporary responsibility. Especially because, you know, he was the only adult in that immediate vicinity while he was out on the couch. They were allowed to go out on the couch, and he was allowed to supervise them. By purview, he was the trusted adult. [K.H.] I think testified and [W.A.] testified that he was the only person that we would trust to babysit the kids because, you know, he was that close of a friend.

Appellant argues that the trial court "erred in extending the responsibility" he "may have had for the children 'when [he] [was] alone with' them, such as when he was expressly

27

asked to babysit them or when he took them away on trips, to the role he played on the night in question." He maintains that he was not alone with W.W. and was neither explicitly nor implicitly assigned temporary care, custody, or responsibility for supervising him that night. According to appellant, he was sleeping on the living room couch as he usually did on Thursdays through Mondays, and W.W. and his brothers were also sleeping in the living room as their parents allowed them to do on weekend and summer nights. Because K.H. and W.A. were in their bedroom, which was next to the living room, there was no evidence that anyone expected or believed appellant had temporary care, custody, or responsibility for the supervision of W.W.

Viewed in its totality, the evidence provided a basis for the jury to reasonably infer that appellant had temporary care or responsibility for W.W. at the time he sexually abused him. The evidence showed that appellant was the family's only babysitter at that time. It was common for K.H. to leave appellant to supervise her children, including W.W. Almost "every weekend" appellant took W.W. somewhere, including out of state. This occurred with the permission of K.H., who viewed appellant as a "second dad" to W.W. That was true on the weekend in question.

On Sunday, July 2, 2023, W.W. had gone somewhere with appellant and the two returned to the family's home at around 11:30 p.m. At that time, K.H. and W.A. were in their bedroom and W.W.'s brothers were in the living room watching a movie. There was no evidence that W.W. interacted with his mother or W.A. after returning home or that there was any temporal break in the relationship between appellant and W.W. The evidence also showed that on the day following the abuse, appellant sent a text to W.W. that said,

28

"I'm coming to get you. We're going to go get new fishing rods." That evidence supports the conclusion that appellant was at liberty to take W.W. places without restriction from his mother or W.A. From the evidence presented, the jury could infer that appellant was responsible for W.W., who was in his care prior to returning home, and that he continued to have responsibility for the child after they returned home.

### III.

Appellant contends that the circuit court committed plain error in admitting prejudicial evidence about why W.W. did not immediately report the abuse. At trial, W.W. was questioned as follows about why he waited to tell his parents about what happened:

[PROSECUTOR]: Did [appellant] kind of – so when it happened in that moment, did you tell your parents about it that night?

[W.W.]: No, not that night; the very next morning.

Q. Yes. That night, why didn't you tell your parents?

A. His, like, fishing bag was, like, right there, and then there was, like, a knife in his fishing bag, and I didn't, like, want, like, anybody to, like, do something to hurt anybody else or anything like that.

Q. Gotcha. So you said [appellant] has a fishing bag?

A. Yeah.

Q. And where was it?

A. Like, right, like, on, like, the coffee table.

Q. And in that fish bag, I think you said there's a knife. What kind of knife is it?

A. It was just like a pocket knife.

Q. So you were – what did you think might happen if you told your parents, like, right then and there?

A. He could have, like, hurt me or, like, my dad or mom could have, like, hurt him.

Q. Did you think anything might happen to [W]?

A. Yeah.

Q. Did you do anything with [W] at the time?

A. Yeah. I, like, pushed him into, like, the crevice, like, of the couch, like, his legs and, like . . .

Q. Why did you do that?

A. To protect him. I didn't want him to, like, get touched or anything.

Q. And when did you push him in the crack in the couch?

A. Before I fell asleep.

Q. And by crack in the couch, do you mean like where the couch bottom cushion meets the backrest?

A. Yes, sir.

Q. So then you said you told your parent the – you fell asleep; is that right?

A. Yes, sir.

Q. And then when you woke up, was [appellant] still in the house?

A. No.

Although appellant did not lodge any objection to W.W.'s testimony on this issue, he argues that the evidence was highly prejudicial and urges us to grant plain error review. He maintains that W.W.'s "explanation for not reporting the abuse right away was not an isolated or unanticipated blurt[,]" that it "was detailed and very deliberately elicited by the

30

prosecutor[,]" that "it was inflammatory with no countervailing probative value[,]" and that it was irrelevant and unfairly prejudicial. Appellant also argues that the prejudice was compounded when the prosecutor, in closing argument, said:

> When asked why, you know, he didn't tell at that time, he said he was scared because he didn't know what the Defendant would do. There was a fishing bag. There was a pocket knife in the fishing bag. He said he didn't know what he would do.

*          *          *

> And [W.W.] told you why he didn't tell them when his parents – yes, they were a room away and they came out for that brief moment and came back in into their bedroom, but he said, I didn't want to tell them because the knife, I was scared for my brother, and he's scared, like, an altercation would ensue is what he pretty much described that either [appellant], the Defendant, would, you know, do something to harm other people or my parents would do something to get in an altercation. He didn't want that to happen, so he waited, unfortunately, and while he waited, he was abused yet again.

Because we shall reverse and remand the case for a new trial on the first issue presented for our consideration, we need not address this argument. Even if we were to address it, we would decline appellant's invitation to grant plain error review.

Pursuant to Maryland Rule 8-131(a), we will generally "not decide any . . . issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]" For an issue to have been raised in or decided by the trial court, "a party, at the time the ruling or order is made or sought, [must] make[] known to the court the action that the party desires the court to take or the objection to the action of the court." Md. Rule 4-323(c). Failure to make known to the court the action that the party desires the court to take or to note an objection results in an unpreserved claim or issue. *Lopez-Villa v. State*, 478 Md. 1, 12 (2022). By requiring an issue to have been raised in or decided by the trial court, the

Rule serves two purposes – to ensure fairness to all parties and to promote "the orderly administration of the law." *Boulden v. State*, 414 Md. 284, 297 (2010). When an objection is properly lodged, the trial court is provided the opportunity to "'pass upon, and possibly correct any errors in the proceedings[.]'" *Paige v. State*, 226 Md. App. 93, 121 (2015) (quoting *Fitzgerald v. State*, 384 Md. 484, 505 (2004)).

The only way we may address an unpreserved issue is through exercising our discretion under plain error review, which is quite a rare phenomenon. *Newton v. State*, 455 Md. 341, 364 (2017). Plain error review is "'reserved for those errors that are compelling, extraordinary, exceptional[,] or fundamental to assure the defendant of a fair trial.'" *Id.* (quoting *Robinson v. State*, 410 Md. 91, 111 (2009)).

Before an appellate court will reverse for plain error, there must be legal error that: (1) was not "intentionally relinquished or abandoned"; (2) is "clear or obvious" rather than subject to reasonable dispute; (3) concerns the appellant's "substantial rights" by affecting the outcome; and (4), if all three conditions are met, the appellate court may remedy the error if it affects the "fairness, integrity[,] or reputation of judicial proceedings." *Winston v. State*, 235 Md. App. 540, 567 (2018) (citing *Newton*, 455 Md. at 364). "[E]ach one of the four conditions is, in itself, a necessary condition for plain error review[.]" *Id.* at 568. "Meeting all four conditions is, and should be, difficult." *Id.* (citing *Givens v. State*, 449 Md. 433, 469 (2016)).

Here, the error complained of was neither clear nor obvious and was subject to reasonable dispute. The record shows that W.W. anticipated the possibility that an altercation might ensue between his parents and appellant and that the altercation could

have been instigated by any of those three people. The evidence was not clearly or obviously inadmissible. It did not suggest that appellant had a propensity for violence or that he, alone, was likely to instigate a physical altercation. The evidence was relevant and admissible to explain W.W.'s delay in reporting the abuse. *See Merzbacher*, 346 Md. at 404-11 (holding that the trial judge did not abuse discretion by admitting evidence of teacher physically and sexually abusing students, drinking and providing alcohol to students, and using vile language against students and faculty because it was probative of the intimidating climate that compelled student's submission to teacher's sexual abuse and their delayed reporting of the abuse). As such, if we were to reach this issue, we would decline to overlook the lack of preservation and would not exercise our discretion to engage in plain error review.

**JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID BY WICOMICO COUNTY.**